Exhibit
8

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 183994612454505, 733419983716627, chris.stimpson.96, and 100011014774891, AND INSTAGRAM USER ID "elitebodykennels", "elite.body.frenchiesss", AND "youngbossstimp" THAT ARE STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-m.j.-120<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Kenneth E. Lockhart, Jr., being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user IDs and Instagram User IDs that are stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachments A through F.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, including the contents of communications pertaining to the subscriber or customer associated with the user IDs.

2.      I have been a sworn Police Officer in Lancaster County, Pennsylvania, since June 1997.  I have a Bachelor's Degree in Criminal Justice from Waynesburg University and graduated from the Allegheny County Police Academy (Pittsburgh) in April of 1997.  I have

attended numerous police schools, seminars and law enforcement training programs in all facets of policing.  As a police detective with the Ephrata Police Department, I am empowered to conduct criminal investigations and have made arrests for violations enumerated in the Pennsylvania Crimes Code (Title 18, Pennsylvania Consolidated Statutes as amended).

3.      I have participated in numerous criminal investigations, either as a witness or prosecuting officer, during the course of which I executed search and arrest warrants, reviewed and analyzed recorded conversations, interviewed suspects and the accused, and debriefed witnesses, including cooperating witnesses and confidential sources.  Said investigations have resulted in numerous arrests and convictions for violations of offenses enumerated in the Pennsylvania Crimes Code (Title 18, Pennsylvania Consolidated Statutes as amended). Additionally, I have received training in controlled substance investigations, identification and prosecutions of the PA Controlled Substance, Drug, Device and Cosmetic Act.  Based upon that training, I have participated in numerous drug related investigations, either as a witness or prosecuting officer.  Said investigations have resulted in numerous seizures of controlled substances, arrests and convictions for violations of the PA Controlled Substance, Drug, Device and Cosmetic Act of 1972.

4.      I have been assigned to undercover drug investigations, patrol, and the K9 unit throughout my career.  I currently serve as a detective assigned to criminal investigations within the Ephrata Police Department, as well as a Capital City Violent Crimes Task Force Officer, with the Federal Bureau of Investigation (FBI).  As a Task Force Officer (TFO), I am currently assigned to a violent crimes task force run by the FBI and charged with conducting investigations into the activities of individuals and criminal groups responsible for such crimes as Hobbs Act robberies, armed bank robberies and violations of other federal firearms statutes.

2

5.      As a TFO, one of my primary duties is the enforcement of federal laws and the security of government witnesses and entities identified during the course of these investigations. As of January 3, 2019, I have obtained FBI-TFO Credentials identifying me as a "Special Federal Officer / Special Deputy – US Marshal," having authority under the United States Department of Justice, pursuant to Title 21 and Title 28.  Moreover, I am a federal task force law enforcement officer engaged in enforcing criminal statutes, including Title 18, U.S.C. § 1951, Hobbs Act Robbery, and Title 18, U.S.C. § 924c, Brandishing a Firearm During a Crime of Violence.  I am authorized by the United States Attorney General to request an arrest complaint.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Except where otherwise noted, the information set forth in this affidavit has been provided to me by Special Agents of the FBI or other law enforcement officers.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I read and reviewed.  Similarly, information resulting from surveillance, except where otherwise indicated, has been provided by other law enforcement officers who conducted such surveillance and thereafter reported the results of the surveillance.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

7.      Because this affidavit is submitted for the limited purpose of obtaining search warrants, I have not included all information known by me or other agents concerning this investigation.  I have set forth only those facts I believe are essential to establish the necessary

foundation for the search warrants.  This affidavit does not exhaust my knowledge or that of other agents of the facts and circumstances surrounding this investigation.

8.      I am familiar with the facts and circumstances of this matter from: (a) my personal participation in this investigation; (b) information provided to me by other law enforcement authorities; (c) information obtained from cooperating witnesses; (d) interviews with witnesses; (e) and the review of documents provided to me by other witnesses. Where actions, statements, conversations and electronic communications of others are reported in this affidavit, they are reported in sum and substance and in part, unless otherwise indicated.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1951, Hobbs Act robbery, and 18 U.S.C. § 2314, interstate transportation of stolen goods, have been committed by CHRISTOPHER LAMONT STIMPSON, Jr. and WILBER CURTIS ARTIS III.  Additionally, there is probable cause showing that TYQUANN BRIM rented the vehicle, used by STIMPSON and ARTIS, during the Hobbs Act Robbery described herein.  There is also probable cause that the information described in Attachment A to the respective warrants contains evidence of these crimes as further described in Attachment B to the respective warrants.

## JURISDICTION

10.      This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

11.      On October 29, 2020, at approximately 11:19 a.m., police officers with the

Ephrata Police Department responded to 685 Wollups Hill Road, (West Cocalico Township),

Stevens, Pennsylvania, for report of a robbery that just occurred.  B.S., a breeder of French

Bulldogs, told officers that two black males robbed him, inside his home, of his five puppies (3

males, 2 females) that he had been offering for sale. B.S breeds and sells French Bulldogs as a

side business.  He advertises his dogs for sale on the website

https://www.lancasterpuppies.com/puppy-for-sale/french-bulldog/rex, and his business attracts

customers both inside and outside of the Commonwealth of Pennsylvania.

12.      B.S. related that a person identifying himself as "Chris" (336-491-4081) from

North Carolina, had contacted him via telephone on or about October 16, 2020, and stated that he

was a broker of French Bulldogs.  "Chris" told B.S that he wanted to purchase the five French

Bulldog puppies, and he and B.S. agreed on a purchase price of $23,500.00.

13.      On October 29, 2020, at approximately 10:00 a.m., "Chris" and another black

male who was introduced to B.S. as "Tre," arrived at B.S.'s place of employment in a gray four-

door Chevrolet Silverado pick-up truck, and then drove B.S. to his residence. B.S. had "Tre"

spell his name for him, and "Tre" provided his phone number (336-404-4772) to B.S.  B.S.

related that the black male identifying himself as "Chris" has short hair and is clean-shaven, and

the black male identifying himself as 'Tre" has cornrows and facial hair.

14.      Upon arrival at his residence, B.S. walked to the kennel at the rear of his

residence and retrieved the five puppies, and carried the puppies back to the house in a white

laundry basket.  The two men then entered the home with B.S. and examined the puppies.

"Chris" used a cellular phone to take a short video of the puppies in the white laundry basket.

5

While in the family room of the home, B.S.'s wife and daughter participated in the meeting/transaction. The men, "Chris" and "Tre," agreed to purchase the puppies.

15.     After the male identified as "Chris" agreed to purchase all five puppies, the male identified as "Tre" went outside to the Chevrolet Silverado and returned a short time later with the purported purchase money, which B.S. described as consisting mainly of $20 bills. Both men stood in the kitchen as B.S. began counting the money at the kitchen table. While B.S. was counting the money, the male identified as "Tre" picked up the basket of puppies and took them out to the truck. While this was happening, the male identified as "Chris" remained in the kitchen and assisted B.S. and his daughter as they continued the count.

16.     Suddenly, the male identified as "Chris" scooped all of the money off of the kitchen table and ran toward the door. While B.S. and his wife grabbed "Chris" around his waist and briefly struggled with him, their daughter ran to an outside shed at the rear of the home, to call 911. The male identified as "Chris" then pulled a black handgun from his jacket and pointed it directly at B.S., causing B.S. to believe that he was going to be shot. B.S. described the handgun as being black and "about" the size of his hand. While still pointing the handgun at them, the male identified as "Chris" demanded that B.S. and his wife pick up all of the money and place it into a plastic ice cream container. After B.S. and his wife had complied, the male identified as "Chris" grabbed the container of money, ran out of the residence, and got into the truck with the male identified as "Tre." As the truck sped away with the five puppies and the money inside of it, B.S.'s daughter copied down the vehicle registration, which was UHS5085 (Virginia).

17.     Subsequent investigation of the vehicle registration for the Chevrolet Silverado revealed that the vehicle was rented from Enterprise Holdings in Greensboro, North Carolina.

6

Upon contacting Enterprise Holdings, investigators learned that the vehicle had been rented by

Tyquann Brim (DOB: *provided but not listed here*) on October 15, 2020, and was due for

return by October 29, 2020. The vehicle was eventually returned by Tyquann Brim to the rental

location on November 2, 2020.

18.     On or about November 2, 2020, B.S. advised me that a person named "Donta"

had contacted him after noticing a video on Instagram that he believed depicted B.S.'s stolen

puppies.  "Donta" had been interested in purchasing one of the five puppies from B.S., however

at the time B.S. had already committed to sell them to "Chris." When the puppies were stolen,

B.S. reached out to "Donta" to let him know that the robbery had occurred.

19.     I subsequently spoke with "Donta," who told me there was a video on Instagram

at "Elite Body Frenchies" with 5 puppies in a white laundry basket.  However, when he tried to

find the video while on the phone with me, he was unable to locate it. "Donta" said that he would

email me the video links when he located the video again, as well as the information on Elite

Body Frenchies and another business identified as Elite Body Kennels, when he found it again.

20.     On November 4, 2020, B.S. received the promised email from "Donta,"

containing the aforementioned photographs and video. Upon viewing the various photographs,

B.S. positively identified each of the robbers as appearing in some of the images.  Upon viewing

the video, B.S. positively identified it as having been recorded inside his home at the time of the

intended sale of his five puppies, which ultimately was aborted due to the armed robbery.

21.     After B.S. had forwarded the photographs and video to me, I reviewed each of

them. During my viewing of the video, I could clearly hear and identify B.S.'s voice in the

background, and see puppies in a white plastic laundry basket. As I continued to view the video,

I could hear the victim speaking in the background, about having promised the puppies.

7

22.     When I next spoke with B.S., he identified photographs of "Chris," and then directed me to one of the photographs in which a male wearing a black sweatshirt and black pants was holding one of the puppies, and identified the male as "Tre," the second man involved in the robbery.[1] Upon my further review of the photographs, I noticed in the third series a photograph of an older African American male holding a puppy in his right hand, and a folder in his left hand.  This man was standing with "Chris" in the photograph. I zoomed in on the photograph to view the folder and believed the folder to be B.S.'s "Lancaster Puppies" folder. B.S. later confirmed that the folder in the photograph had been stolen by the robbers.[2]

23.     Upon receiving this information from B.S., I contacted TFO Keith Springs of the Greensboro Police Department in Greensboro, North Carolina, who is another FBI deputized Task Force Officer. I provided a photo of the individual identified as "Chris" by B.S. to TFO Springs, who ran the photo through a local police database, which positively identified the individual in the photo as CHRISTOPHER LAMONT STIMPSON, Jr. Notably, the address listed for STIMPSON in the Greensboro Police database is the exact same address listed for Tyquann Brim, the renter of the Chevrolet Silverado that was involved in the robbery.

24.     On November 6, 2020, during a review of the Ephrata Police Department investigative reports regarding this case, I noticed that Officer Sean O'Hanlon conducted a TLOxp[3] search on "Tre's" telephone number. TLOxp identified the telephone number identified

---

[1] During a Mirandized interview following his arrest in North Carolina, Wilbert Artis specifically denied that he was the individual depicted in the photograph, however, he admitted that he was the individual named "Tre" who accompanied Christopher Stimpson to Pennsylvania, and to the residence of B.S.

[2] Photographs identified by B.S. are included as Attachments C through F.

[3] TLOxp is a database that allows law enforcement to search hundreds of millions of records. Transunion TLOxp aggregates data from over 10,000 sources to give a wide reaching public and proprietary database that delivers vital

as belonging to Wilbert Curtis Artis III, of Greensboro North Carolina.  On this same day, I searched criminal history information on Wilbert Curtis Artis III.  After I discovered that a criminal history did exist, I immediately discovered that Wibert Artis III has two middle names associated with his criminal history.  Those two middle names are "Curtis" and "Trey."

25.     After developing this new information, I contacted TFO Keith Springs and provided him with a photo of the individual identified by B.S. as "Tre." TFO Springs ran the photo and the name, Wilbert Artis III, through a local police database, and I positively identified the individual in the photo as WILBERT CURTIS ARTIS III.

26.     I have located the following Facebook and Instagram profiles for STIMPSON and BRIM, most of which feature photos of them as the profile picture:[4] (a) Facebook Profile name "Elite Body Kennels" Facebook URL www.facebook.com/-Elite-Body-Kennels--183994612454505  (**SUBJECT ACCOUNT 1**); (b) Facebook Profile name "Elite Frenchies" Facebook URL www.facebook.com/Elite-Frenchies-733419983716627 (**SUBJECT ACCOUNT 2**); (c) Facebook Profile Name "Chris Stimpson" Facebook URL www.facebook.com/chris.stimpson.96 (**SUBJECT ACCOUNT 3**); (d) Facebook Profile Name "Maine Brim" user ID 100011014774891 (**SUBJECT ACCOUNT 4**); (e) Instagram Profile name "elitebodykennels" Instagram URL www.instagram.com/elitebodykennels/ (Subject Account 5); (f) Instagram Profile name "elite.bodyy.frenchiesss" Instagram URL www.instagram.com/elite.bodyy.frenchiesss/ (Subject Account 6); (g) Instagram Profile name

---

multi-jurisdictional information about people, businesses, and assets. Various search criteria can be used including, but not limited to, names, addresses, phone numbers, social media profiles, and email addresses.

[4] The information contained in this affidavit regarding the suspects' Facebook and Instagram accounts was obtained by viewing the publicly accessible versions of the respective pages (i.e., the versions that are accessible to all Facebook and Instagram users, not the versions accessible to the suspects' Friends or Followers).

"youngbossstimp" Instagram URL www.instagram.com/youngbossstimp/ (Subject Account 7).

27.     Based on your Affiant's experience, training, knowledge and years as a criminal investigator as well as common knowledge, your Affiant is aware that social media content including instant messages, picture messages, pictures, videos, contacts, incoming messages, and outgoing messages can be retrieved from social media acounts, such as Facebook and Instagram. Additionally, social media can be accessed through cell phones, as well as other electronic devices. Since a cellular phone is a mobile device, it is often carried by the user at all times, making it easily accessible to take pictures, record videos, and send messages through social media and social networking sites. Furthermore, the pictures and videos can be immediately uploaded to the social media sites.

28.     Common sense and common knowledge dictate that those who engage in criminal conduct, attempt to conceal their conduct from the police. People involved in the commission of crimes often utilize cell phones to maintain contact with criminal associates to communicate their wherabouts and illegal activities. Contact can be made through text messages, email, and/or social media/networking sites. This investigation has revealed that at least one video of the stolen French Bulldog puppies has been viewed on Instagram. There is probable cause to believe that if Stimpson uploaded a video to one social media site, he uploaded additional pictures and videos to other sites used by him. The investigation also revealed that Stimpson and Artis may have intended to subsequently sell the stolen puppies.  As a result I believe that probable cause exits to believe the Facebook and Instagram may house information, consistent with this warrant, that indicate that intention as well as possession of the stolen puppies.  Additionally, because Tyquann Brim rented the vehicle used to facilitate the robbery, there is probable cause to believe that Brim and Stimpson communicated through social media during the rental period for the

10

vehicle, which necessarily includes the time of the robbery. Such communications are likely to include information concerning events that occurred during the trip to Pennsylvania, and may even discuss criminal activity as it relates to the robbery. The data retrieved from Facebook and Instagram will assist the investigation by corroborating the timeline of events surrounding the robbery, identifying the culpable parties involved, and assist investigators in identifying and locating any other relevant evidence of the charged crimes.

## INFORMATION REGARDING FACEBOOK

29.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

31.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account

11

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

36.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

38.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

41.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

43.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

14

## INFORMATION REGARDING INSTAGRAM

44.     From my review of publicly available information provided by Instagram about
its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram
and about the information collected and retained by Instagram.

45.     Instagram is a social networking service that is owned by Facebook, and
Instagram's records are maintained by Facebook.  Instagram instructs law enforcement officials
seeking Instagram account records to address any requests to Facebook, Inc.

46.     Users can access Instagram through the Instagram website (www.instagram.com)
or by using a special electronic application ("app") created by the company that allows users to
access the service through a mobile device.  Instagram allows its users to create their own profile
pages, which can include a short biography, a photo of themselves, and other information.
Instagram permits users to post photos to their profiles on Instagram and otherwise share photos
with others on Instagram, as well as certain other social-media services, including Flickr,
Facebook, and Twitter.  When posting or sharing a photo on Instagram, a user can add to the
photo: a caption; various "tags" that can be used to search for the photo (e.g., a user may add the
tag #vw so that people interested in Volkswagen vehicles can search for and find the photo);
location information; and other information.  A user can also apply a variety of "filters" or other
visual effects that modify the look of the posted photos.  In addition, Instagram allows users to
make comments on posted photos, including photos that the user posts or photos posted by other
users of Instagram.  Users can also "like" photos.

47.     Upon creating an Instagram account, an Instagram user must create a unique
Instagram username and an account password.  This information is collected and maintained by
Instagram/Facebook.

48.     Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram.  Once an account is created, users may also adjust various privacy and account settings for the account on Instagram.  Instagram/Facebook collects and maintains this information.

49.     Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram/Facebook collects and maintains this information.

50.     Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user.  Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

51.     Instagram allow users to post and share various types of user content, including photos, videos, captions, comments, and other materials.  Instagram/Facebook collects and maintains user content that users post to Instagram or share through Instagram.

52.     Instagram users may send photos, videos and messages to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

53.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

54.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

55.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram.  For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

56.     Instagram also collects information on the particular devices used to access Instagram.  In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

57.     Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

58.     Instagram also may communicate with the user, by email or otherwise.  Instagram/Facebook collects and maintains copies of communications between Instagram and the user.

17

59.     As explained herein, information stored in connection with a Facebook or

Instagram account may provide crucial evidence of the "who, what, why, when, where, and

how" of the criminal conduct under investigation, thus enabling the United States to establish

and prove each element or alternatively, to exclude the innocent from further suspicion.  In my

training and experience, a Facebook or Instagram user's IP log, stored electronic

communications, and other data retained by Facebook, can indicate who has used or controlled

the Facebook or Instagram account.  This "user attribution" evidence is analogous to the search

for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile

contact information, private messaging logs, status updates, and tagged photos (and the data

associated with the foregoing, such as date and time) may be evidence of who used or controlled

the account at a relevant time.  Further, Facebook and Instagram account activity can show how

and when the account was accessed or used.  For example, as described herein, Facebook and

Instagram (owned by Facebook) log the Internet Protocol (IP) addresses from which users access

their accounts along with the time and date.  By determining the physical location associated

with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation.  Such information

allows investigators to understand the geographic and chronological context of Facebook and

Instagram access, use, and events relating to the crime under investigation.  Additionally,

Facebook and Instagram build geo-location into some of their services.  Geo-location allows, for

example, users to "tag" their location in posts and Facebook or Instagram "friends" to locate

each other.  This geographic and timeline information may tend to either inculpate or exculpate

the account owner.  Last, Facebook and Instagram account activity may provide relevant insight

into the account owner's state of mind as it relates to the offense under investigation.  For

example, information on the Facebook or Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

60.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook and Instagram, such as account access information, transaction information, and other account information.

61.     Based on my training and experience, I know that people who engage in robberies will often communicate with their coconspirators and/or accomplices by way of cellular telephone (including via text message, iMessage and social media applications) before, during, and after the commission of a robbery.  Also, in my experience, prior to committing robberies, the prospective perpetrators will often "case" (i.e. conduct surveillance of) their targets and communicate with each other by telephone to make arrangements to meet and commit the robbery.  Therefore, analysis of call detail records, text communications and cell site information from the suspects' telephone numbers and social media accounts can assist law enforcement in determining individuals and/or businesses targeted by the robbery crew.  In addition, robbery crews often consist of numerous members who participate in some offenses but not others. Therefore, it is possible that a member who participated in one offense did not participate in all offenses committed by the crew.  Analysis of call detail records, text communications and cell site information from the suspects' telephone numbers and social media accounts can assist law enforcement in identifying additional suspects and/or proving or ruling out a suspect's involvement in a particular robbery.  Further, I am aware that people who engage in robberies

19

will often use the internet (including on their cell phones) to search for information about their intended victims, such as the locations and hours of businesses.  Further, I am aware that people who engage in robberies often possess photographs (including in their phones and in their social media accounts) of themselves and their coconspirators/accomplices; the victims of their robberies; clothing worn during the robberies; weapons and other items used during the robberies; the proceeds of their robberies; and items purchased with the proceeds of the robberies.  I also know from my training and experience that criminals, including those who engage in robberies, often have multiple phones to facilitate their commission of illegal activities while attempting to thwart identification by law enforcement through the use of multiple phones or "burner" phones which cannot be traced back to an individual.  This same rationale holds true for social media accounts – criminals often maintain multiple accounts, and often use fake names associated with those accounts.

62.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

63.    I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Facebook to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B to the respective warrants.  Upon receipt of the information described

in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B to the respective warrants.

## **CONCLUSION**

64.     Based on the forgoing, I request that the Court issue the proposed search warrants.

65.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of these warrants.  Because the warrants will be served on Facebook who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

66.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

*/s Kenneth E. Lockhart, Jr.*
Kenneth E. Lockhart, Jr.
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to
before me on January 22, 2021

__/s/ Elizabeth T. Hey_____
HONORABLE ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook user IDs (the "accounts") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, CA:

    a.   Facebook user ID/URL: **Elite-Body-Kennels-183994612454505**

    b.   Facebook user ID/URL: **Elite-Frenchies-733419983716627**

    c.   Facebook user ID/URL:  **chris.stimpson.96**

    d.   Facebook user ID/URL: **100011014774891**

This warrant also applies to information associated with the following Instagram usernames (the "accounts") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, CA:

    a.   Instagram username "elitebodykennels"

    b.   Instagram username "elite.bodyy.frenchiesss"

    c.   Instagram username "youngbossstimp"

## ATTACHMENT B

## Particular Things to be Seized

### I.   Information to be Disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government, in unencrypted form whenever available, for each user ID/URL listed in Attachment A:

    a.   All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.   All activity logs for the account and all other documents showing the user's posts and other Facebook activities from October 15, 2020, through the signature date of this warrant;

    c.   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d.  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall/Timeline postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f.  All other records and contents of communications and messages made or received by the user from October 15, 2020, through the signature date of this warrant; including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.  All "check ins" and other location information;

h.  All IP logs, including all records of the IP addresses that logged into the account;

i.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.  All information about the Facebook pages that the account is or was a "fan" of;

k.  All past and present lists of friends created by the account;

l.  All records of Facebook searches performed by the account from October 15, 2020, through the signature date of this warrant;

24

m.  All information about the user's access and use of Facebook Marketplace;

n.  The types of service utilized by the user;

o.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

q.  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

**II.  Information to be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1951 or 924(c) involving CHRISTOPHER STIMPSON, WILBER ARTIS, or TYQUANN BRIM, including, for each user ID listed on Attachment A, information pertaining to the following matters:

a.  All items pertaining to the planning or commission of robberies and brandishing a firearm; the possession, procurement, distribution or storage of firearms or ammunition; and the distribution, expenditure or location of proceeds of robberies.

b.  The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

25

c.  Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crimes under investigation and the Facebook account owner;

d.  Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

e.  Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts; and

f.  All account information, including:

(1)  Contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(2)  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number or digital money transfer account information);

(3)  All privacy settings and other account settings;

(4)  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string; and

(5)  All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

26

**Particular Things to be Seized (ATTACHMENT B continued)**

**III. Information to be Disclosed by Facebook/Instagram**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), which is the owner of Instagram, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government, in unencrypted form whenever available, for each username listed in Attachment A:

    a. All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b. All activity logs for the account and all other documents showing the user's posts and other Instagram activities from October 15, 2020, through the signature date of this warrant;

    c. All photos and videos uploaded by that username and all photos and videos uploaded by any user that have that username tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

    d. All profile information, status updates, videos, links to videos, photographs, articles, and other items, notes, wall postings, friend lists (including the friends' Instagram usernames and user identification numbers), future and past event

postings, rejected "Friend" requests, comments, gifts, pokes, tags, and information about the user's access and use of Instagram applications;

e.   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that username, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f.   All other records and contents of communications and messages made or received by the user from October 15, 2020, through the signature date of this warrant; including all direct and private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.   All "check ins" and other location information;

h.   All IP logs, including all records of the IP addresses that logged into the account;

i.   All records of the account's usage of the "Like" feature, including all Instagram posts and all non-Instagram webpages and content that the user has "liked";

j.   All information about the Instagram pages that the account is or was a "fan" of;

k.   All past and present lists of friends created by the account;

l.   All records of Instagram searches performed by the account from October 15, 2020, through the signature date of this warrant;

m.   The types of service utilized by the user;

n.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

o. All privacy settings and other account settings, including privacy settings for individual Instagram posts and activities, and all records showing which Instagram users have been blocked by the account; and

p. All records pertaining to communications between Facebook/Instagram and any person regarding the user or the user's Instagram account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of service of this warrant.

## IV. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 1951 or 924(c) involving CHRISTOPHER STIMPSON, WILBER ARTIS, or TYQUANN BRIM, including, for each username listed on Attachment A, information pertaining to the following matters:

a. All items pertaining to the planning or commission of robberies or brandishing a firearm; the possession, procurement, distribution or storage of firearms or ammunition; and the distribution, expenditure or location of proceeds of robberies.

b. The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

c. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the Instagram account owner;

d. Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

e.  Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts; and

f.  All account information, including:

(1) Contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(2) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number or digital money transfer account information);

(3) All privacy settings and other account settings;

(4) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that username, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string; and

(5) All records pertaining to communications between Facebook/Instagram and any person regarding the user or the user's Instagram account, including contacts with support services and records of actions taken.

**ATTACHMENT C**



**ATTACHMENT D**



6

**ATTACHMENT E**



**ATTACHMENT F**



## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws
<em>Name</em>

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct. I am employed by _____
<em>Entity</em>

(hereinafter "the entity"), and my title is _____. I am qualified
<em>Title</em>

to authenticate the records attached hereto because I am familiar with how the records were

created, managed, stored, and retrieved. I state that the records attached hereto are true

duplicates of the original records in the custody of the provider. The attached records consist of

_____. I further state that:
<em>Generally describe records (pages/CDs or DVDs/megabytes)</em>

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of the entity, and they were made by the entity as a regular practice; and

b.      such records were generated by the entity's electronic process or system that

produces an accurate result; and

2

      c.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of the entity in a manner to ensure that they are true duplicates of the original records.

      I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____   _____

Date                         Signature